**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| Raven's Place, LLC, an Illinois Limited Liability Company, d/b/a "Raven's Place" and Raven's Place, LLC, an Illinois Limited Liability Company d/b/a The Vault Entertainment Group, Dushone Thomas, individually, and Raymond Thomas, individually, | Case No. 23-cv-00728 |
| | Judge Mary M. Rowland |
| Plaintiffs. | |
| v. | |
| The City of Blue Island, an Illinois Municipal Corporation, Fred Bilotto, in his individual capacity and as Mayor of the City of Blue Island. | |
| Defendants. | |

## PLAINTIFFS' FIRST AMENDED COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiffs Raven's Place, LLC, an Illinois Limited Liability Company d/b/a "Raven's Place", Raven's Place, LLC, an Illinois Limited Liability Company, Raven's Place, LLC, an Illinois Limited Liability Company d/b/a "The Vault Entertainment Group", Dushone Thomas, and Raymond Thomas (collectively, "Plaintiffs"), by and through their attorneys, bring this action against Defendants, City of Blue Island, an Illinois Municipal Corporation ("Blue Island" or "the City") and Fred Bilotto ("Bilotto") in his individual capacity and as Mayor of the City of Blue Island (collectively "Defendants"). In support of this First Amended Complaint, Plaintiffs state as follows:

## NATURE OF THE ACTION

1.      This racial discrimination case arises from the City of Blue Island's unequal

1

treatment of two black owned businesses: Raven's Place and The Vault. Since opening in October of 2011, both establishments were licensed to offer a full bar to patrons over the age of twenty-one.

2.      Following a criminal incident that took place outside the Vault in May of 2021, Blue Island shut down both of Plaintiffs' businesses The Vault and Raven's Place.  Soon after, Defendants approached Plaintiffs and informed them that, unless they agreed to a list of restrictions on their businesses, they would be unable to operate in Blue Island.

3.      These restrictions severely inhibited Plaintiffs' ability to run their businesses and imposed undue restrictions on them such as increased age requirements for both establishments and forcing Plaintiffs to hire a security firm chosen by the City. These restrictions were arbitrarily applied and done so with discriminatory intent. Indeed, other similarly situated businesses owned in Blue Island have received far more lenient discipline for more serious incidents that took place inside of their establishments. The key difference between those businesses and Plaintiffs' is that Raven's Place and The Vault are black owned business

## **PARTIES**

4.      Raymond Thomas ("Thomas") manages several small businesses in the City of Blue Island. Among these businesses are two entertainment establishments: Raven's Place and The Vault Entertainment Group ("The Vault").

5.      Raven's Place, LLC is owned by Dushone Thomas and managed by Raymond Thomas, both African Americans. Raven's Place LLC is an Illinois Limited Liability Company incorporated in the state of Illinois and authorized to do business within the State of Illinois.

6.      Raven's Place, LLC operates two different businesses. Raven's Place is a bar and

2

nightclub. The Vault is a video game amusement center catered to children and adults. Both establishments do business in the City of Blue Island.

7.      The City of Blue Island is a municipal corporation, body politic, and a non-home rule unit of government located in Cook County, Illinois.

8.      Defendant Fred Bilotto is an individual and Defendant Blue Island's Mayor.

9.      At all times relevant to this Complaint, Bilotto was the Local Liquor Commissioner for the City of Blue Island.

10.     In his capacity as a policymaker for the City of Blue Island, Bilotto approved the Agreement on behalf of Blue Island.

11.     Bilotto is a final policymaker with regards to liquor license decisions the agreement on behalf of Blue Island and is a final policymaker with regards to liquor license decisions and was so in regards to all aspects of the investigation into Plaintiffs businesses and all subsequent actions taken against Plaintiffs businesses.

12.     As a policymaker for any liquor license decisions in Blue Island and in his capacity as the Mayor of Blue Island, Bilotto approved of any restrictions placed on the liquor and businesses licenses for bars and restaurants in the City of Blue Island.

## **JURISDICTION AND VENUE**

13.     This matter was originally filed in the Circuit Court of Cook County.

14.     On February 6, 2023, Defendants Removed this matter to the Northern District of Illinois listing "Federal Question" as the basis for Subject Matter Jurisdiction.

15.     Jurisdiction is proper because one or more counts within Plaintiff's Amended Complaint involve federal questions, this court has original jurisdiction under 28 U.S.C. §§1331 and 1343.

3

16.     This Court has personal jurisdiction over this matter because the alleged within this Complaint took place in Illinois.

17.     Venue is proper in the Northern District of Illinois as the Defendants are domiciled in the Northern District of Illinois and the occurrences alleged in this Complaint took place primarily in the Northern District of Illinois.

## FACTS APPLICABLE TO ALL COUNTS

18.     Raymond Thomas operated and managed Raven's Place and The Vault in the City of Blue Island at their respective addresses, 13031 S. Western Ave, Blue Island, Illinois and 13057 S. Western Ave, Blue Island, Illinois.

19.     Both establishments offered a full bar to patrons over the age of twenty-one. As such, both Raven's Place and the Vault were licensed with Blue Island's liquor commission to serve alcohol prior to their closures. *See Liquor Licenses Attached as Group Exhibit A.*

20.     Since opening in October 2011, Raven's Place and The Vault have experienced two instances of violent crime outside of the establishments.

### *The Agreement*

21.     In May of 2021, The Vault was shut down for a period of seven days by Blue Island's liquor commission from May 7, 2021 to May 14, 2021.

22.     During this seven-day period, Plaintiffs availed themselves of their right to be heard on the issues before the liquor commission.

23.     Before Plaintiffs could be heard, Blue Island approached Plaintiffs about the possibility of settling the dispute between the parties which would allow Plaintiffs to keep their businesses open.

4

24. Blue Island provided the required terms for this agreement and advised Plaintiffs that they needed to agree in order to stay in business ("the Agreement").

25. Blue Island, however, as a non-Home Rule municipality, did not have the legal authority to force Plaintiffs into this Agreement.

26. Despite knowing the limited scope of its powers, Blue Island purported to enter into this Agreement to the Plaintiffs.

27. The purported Agreement outlined a number of restrictions and security measures that both Raven's Place and The Vault would be required to follow. *See May Agreement attached as Exhibit B.*

28. Pursuant to the Agreement, The Vault was required to:

a) Implement the use of identification scanners and scan the IDs of every patron prior to entry;

b) Refuse entry to any patron under the age of twenty-five (25);

c) Cease the sale of any alcohol after 2:00 a.m.;

d) Close its premises by 2:30 a.m.;

e) Submit and sign the security plan; and

f) Schedule an onsite meeting with City staff to reevaluate occupancy limits, liquor license classifications, and compliance with Fire, Health, and Building Codes.

29. Despite the fact that the City did not provide any evidence of a violent incident within Raven's Place in the Emergency Closure Order regarding the May 2021 incident, the Agreement required similar restrictions on Raven's Place.

30. Indeed, the Agreement required Raven's Place to:

a) Implement the use of identification scanners and scan the IDs of every patron

prior to entry;

b)   Refuse entry to any patron under the age of thirty (30);

c)   Cease the sale of any alcohol after 1:30 a.m.;

d)   Close its premises by 2:00 a.m.;

e)   Submit and sign a security plan; and

f)   Schedule an onsite meeting with City staff to reevaluate occupancy limits, liquor license classifications, and compliance with Fire, Health, and Building Codes.

31.    In addition to the foregoing terms, Plaintiffs were required to pay a $7,500 fine in full before The Vault could reopen.

32.    Plaintiffs did not draft the terms of the Agreement, nor did they believe that they had the ability to negotiate these required terms further with Blue Island.

33.    Plaintiffs signed the Agreement because they believed they had no other choice in order to continue the operation of their businesses and out of their need to make a living.

***The Security Plan***

34.    The restrictions set forth in the Agreement were not the only restrictions Plaintiffs were required to follow to reopen The Vault. Plaintiffs were also told that they would have to create a Security Plan following specific requirements, which is the makeup of the Security Plan.

35.    As a non-Home Rule Municipality, Blue Island did not have the authority to require Plaintiffs to agree and/or abide by a Security Plan.

36.    After Blue Island informed Plaintiffs of the restrictions that it intended to impose pursuant to the Agreement, Blue Island informed Plaintiffs that they would have to submit to a security plan in order to reopen.

37.     Here again, Blue Island provided the terms of the Security Plan. In fact, Raymond Thomas was told by Blue Island officials what specifically had to be included in the Security Plan.

38.     Under the terms of the Security Plan required by Blue Island, Plaintiffs were required to implement a number of additional security measures that were not outlined in the original Agreement. *See Raven's Place LLC Security Plan attached as Exhibit C.*

39.     The additional restrictions included in the Security Plan required:

a)   That Plaintiffs must contract with a private security team, chosen by the City, to secure the interior and exterior of the premises;

b)   That the premises be outfitted with security cameras capable of recording to on-premise and off-premises NVR's with a storage capacity of three days;

c)   That the Vault designates or hires an employee to monitor all security cameras throughout the premises in real time to identify "problematic or potentially problematic situations";

d)   That security personnel be equipped with 2-way radios so as to "avert any issue before it becomes problematic";

e)   That The Vault operates only between the hours of 11:00 a.m.—2:00 a.m. Sunday through Friday and 11:00 a.m. to 2:30 a.m. on Saturdays;

f)   The Vault's security team to conduct full body searches and pat downs depending on the "nature and type of event being held at the venue";

g)   Implement the use of "hand clickers" to count the number of patrons and monitor occupancy;

h)   Provide the Blue Island Police Department a weekly line-up of events listing the nature of the event, the expected number of patrons, time of the event, and the event's host(s);

i)   That the venue purposely change its music within 30 minutes of closing to a genre with a slow tempo and reduce the services provided within the venue; and

j)   That management attend monthly meetings with the Chief of Police to review any issues of concern or problem during the month.

40.     Plaintiffs objected to these requirements for various reasons, but specifically on the

grounds that The Vault had previously marketed to children and young adults under the age of twenty-one.

41.     Indeed, the revenue from young adults and children accounted for approximately 70% of the Vault's revenue before the restrictions.

42.     Despite Plaintiffs' objections, Plaintiffs were forced to agree to the terms provided by Blue Island in order to reopen their businesses.

43.     Plaintiffs implemented all restrictions and obligations set forth therein.

44.     Blue Island, however, never executed the Security Plan and, in fact, expressed doubt regarding whether the plan was satisfactory when asked.

45.     Specifically, Plaintiff signed the Security Plan and delivered it to Blue Island.

46.     After time passed without Blue Island returning a countersigned version of the Security Plan, Mr. Thomas, stopped by City Hall to speak with Blue Island officials.

47.     Mr. Thomas asked a City Hall official for an update on the return of a countersigned Security Plan.

48.     In response, the City official indicated that Blue Island was unsure whether the Security Plan as drafted would be acceptable to Blue Island or not.

49.     As of the date of this filing, Plaintiffs have never seen a version of the Security Agreement executed by Blue Island.

***The September Incident***

50.     On September 17, 2022, a shooting occurred in a city lot at or near 13011 to 13023 New Street, Blue Island, Illinois.

51.     The shooting did not take place on Plaintiffs' property and took place after Raven's

Place had stopped serving customers for the evening. Moreover, the shooting took place on a public municipal lot approximately a half block away from Raven's Place.

52.     As a result of the shooting, two individuals were injured and taken to a local hospital.

53.     That same day, Defendants issued an Emergency Closure Order shutting down both Raven's Place and The Vault for a seven-day period from September 17, 2022 to September 24, 2022.

54.     During this seven-day period, Plaintiffs contacted the Local Liquor Commissioner, Bilotto, and the City Attorney to hold a hearing regarding the closure order.

55.     At the hearing, Raymond Thomas, on behalf of both Raven's Place and The Vault, objected to the closure of both establishments and expressed Plaintiffs' efforts to comply with the requirements imposed on them by the City.

56.     Other bars in Blue Island were subjected to far more lenient discipline by the Local Liquor Commission for more serious violent incidents that took place at each establishment.

57.     After this hearing, the City ordered that Raven's Place violated the Agreement and various sections of the City Code, and therefore revoked Plaintiff's retail liquor licenses.

58.     Plaintiffs subsequently appealed that order, and Plaintiffs' businesses remained open pending an appeal to the Illinois Liquor Control Commission.

59.     The Illinois Liquor Control Commission denied Plaintiffs' Appeal.

60.     Plaintiffs are currently, and separately, contesting the denial of the Appeal in the Circuit Court of Cook County.

***Blue Island's Disparate Treatment of Similarly Situated Businesses***

61.     Burr Oak Bowl ("Burr Oak"), located at 3030 W 127th Street, Blue Island, Illinois 60406, operates a bowling alley in Blue Island also offers a full-service bar.

62.     Upon information and belief, the owner of Burr Oak is of Caucasian descent.

63.     Plaintiffs have recently learned that, on or about January 11, 2022, a fight broke out between two intoxicated patrons of Burr Oak where one patron discharged a firearm while inside the bowling alley. *See Burr Oak Emergency Closure Order attached as Exhibit D.*

64.     Three of Burr Oak's patrons were injured from the fight that erupted inside their business and the resulting fight outside. One of the injured patrons was fatally wounded from the gunshot.

65.     In response, Bilotto, in his capacity as the Local Liquor Control Commissioner, ordered the emergency closure of Burr Oak. The closure, however, did not contain nearly the same level of restrictions that were assessed against Plaintiffs in May 2021.

66.     Indeed, the Emergency Closure Order for Burr Oak did not require Burr Oak to limit its hours of operation, limit the age of its patrons, submit weekly reports to the Blue Island police, implement real time security surveillance, or hire a private security team.

67.     Rather, the Burr Oak Closure Order temporarily suspended Burr Oak's liquor license for seven days while allowing Burr Oak to operate as bowling alley.

68.     The second similarly situated business is Cyprus Long Bar, Inc. d/b/a Harry's Long Bar ("Harry's"), located at 13115 S Western Ave, Blue Island, Illinois 60406.

69.     Upon information and belief, the owner of Harry's Long Bar is of Caucasian descent.

70.     On January 16th, 2022, a patron of Harry's discharged a firearm inside Harry's.

The shooter then fled the scene. *See Harry's Long Bar, Inc. Emergency Closure Order attached as Exhibit E.*

71.     When police responded to the shooting at Harry's, officers learned that Harry's bartender for the evening of the shooting was 18 years old.

72.     Despite the fact that a shooting took place in their business and that their bartender was under the age of 21, Harry's received a mere seven-day suspension.

73.     In Harry's case as well, the emergency closure issued by Defendants did not contain nearly the same level of restrictions that were assessed against Plaintiffs in May 2021.

74.     Indeed, the City's Chief of Police agreed that the restrictions imposed on Plaintiffs' businesses were more restrictive than those imposed on Harry's following the January 2022 shooting.

75.     Plaintiffs' investigation into the City's response to other instances of crime at businesses in the City revealed that at least one additional business had experienced violent crime in 2022.

76.     In February 2022, City police responded to an incident at Carlito's Way where shots were fired through the bar's window into the bar. This cocktail lounge is located at 2146 Vermont Ave, Blue Island, Illinois 60406.

77.     Upon information and belief, the owner of Carlito's Way of Caucasian descent.

78.     In this instance, the bar was allowed to enter into a security plan.

79.     In investigating the incident at Carlito's, and the City's responses to the same, Plaintiffs issued a FOIA to the City.

80.     The City, however, did not provide Plaintiffs with a copy of any security plans

relating to these similarly situated businesses.

81.     Upon information and belief, Carlito's has had three shootings in the last two years—the most of any Blue Island establishment in this timeframe.

82.     Upon information and belief, and from Plaintiffs' own observations and experiences, Carlito's was not restricted to the same extent as Plaintiffs' businesses.

83.     In August 2022, a man was killed, and another critically hurt at the Forge Pub in Blue Island during an altercation at the bar.

84.     Upon information and belief, the Forge Pub had one or more of their licenses revoked.

85.     Upon further information and belief, the Forge Pub was managed by an African American at the time of this incident.

86.     Tommy's Place, located at 12237 Western Ave, Blue Island, IL 60406,  operates as a bar in Blue Island.

87.     Upon information and belief, the owner of Tommy's Place is of Caucasian descent.

88.     Upon information and belief, two separate shootings have taken place at Tommy's Place. The most recent of which occurred in May 2024.

89.     Tommy's Place is currently open and Tommy's Place was not shut down by the City of Blue Island following the most recent shooting in May 2024.

90.     The Agreement and Security Plan for Tommy's Place was not as restrictive as the Agreement and Security Plans for Raven's Place and The Vault in the following ways:

> a) Patrons aged twenty-one through thirty were allowed to enter Tommy's Place for sporting events when accompanied by older family members;

12

    b) Tommy's Place was not required to change its music prior to closing;

    c) Tommy's Place was not required to schedule onsite meetings with City staff to evaluate occupancy limits, liquor license classifications, and compliance with Fire, health and Building Codes;

    d) Provide the Blue Island Police Department with a weekly line-up of events listing the nature of the event, the expected number of patrons, time of the event, and the event's host(s);

    e) Ensure that security personnel are equipped with 2-way radios so as to "avert any issues before it becomes problematic;" and/or

    f) Hire and designate an employee to monitor all security cameras throughout the premises in real time to identify problematic situations.

### *Blue Island's History of Discrimination*

91.    Unfortunately, the above-described experiences of Raven's Place and the Vault are not the only instances when Blue Island has been accused of disparate treatment based on race.

92.    In 2018, the City revoked Island Bar and Grill's license shut the business down after a shooting outside the restaurant.

93.    The owner of Island Bar and Grill believes that the real reason for the closing is that the City did not like the clientele of Island Bar and Grill because they are African American. Moreover, in 2019, the former Chief of Police, LaSalle King, an African-American, told the City when he announced his retirement that the City, including an Alderman, criticized the people he brought up, criticized him trying to better the department, all for political reasons and possibly because he was African-American.

94.    Other African-American owned or operated businesses such as Platinum 127, a bar located in Blue Island, have experienced differential treatment when compared to the more lenient treatment that non-African-American owned businesses.

95.     On April 6, 2022, the owner of Double Play, a Caucasian male, was caught on social media making racist comments in front of Raven's Place because the Plaintiffs' establishments are black-owned/operated and have predominantly African American customers.[1] Despite the owner of Double Play's use of hate speech in the presence of Blue Island police, including repeated use of the n word, no consequences were imposed by the City.

96.     Specifically, the owner of Double Play repeatedly used the N word in the presence of Blue Island officials.

97.     Defendants never restricted Double Play in the same manner as they have restricted Plaintiffs despite the described, and other, criminal activity occurring near that establishment.

98.     Instead, Blue Island simply tolerated the Double Play's hate speech directed toward Plaintiffs and their patrons.

### Plaintiffs' Meeting with Blue Island

99.     The increased restrictions imposed on Plaintiffs' businesses were not Plaintiffs' first interaction with the City or its administration.

100.    Prior to Blue Island forcing them to agree to the aforementioned restrictions on the businesses, Raymond Thomas met with City officials.

101.    Among those present at the meeting included Defendant Bilotto. During the meeting, a City representative commented on Plaintiffs' clientele stating that Raven's Place and The Vault's clientele were "not as sophisticated or tame" anymore supposedly due to their age.

102.    In response, Thomas informed the City that the age range of his crowd had not really changed since he opened these businesses, to which City officials responded, "you know

---

[1] https://www.instagram.com/p/CcAMdaGuKTu/?hl=en&img_index=1

what we're talking about."

103.    Thomas then directly asked in response to that comment whether the City was referring to Plaintiffs' black clientele.

104.    After an initial pause, a City official warned Thomas, "with the business that you have now, you're going to have nothing but problems" and that the City has had a conversation with the police and mayor about Plaintiffs' crowd.

105.    Since they were opened, the racial make-up of the customers of Raven's Place and The Vault has varied from approximately 80% to 90% African American.

106.    Plaintiffs have observed Blue Island and its officials tolerating overtly racist conduct.

107.    Moreover, Plaintiffs experienced difficulties attempting to renew their liquor license that non-minority owned businesses have not had to experience.

108.    On January 1, 2023, the City issued an emergency closure order, alleging that Plaintiff violated the Illinois Liquor Control Act and Blue Island Code, subsequently revoked/refused to renew Plaintiffs' business licenses and liquor licenses.

***Blue Island Interferes with Plaintiffs' Attempts to Rebuild Raven's Place***

109.    On or about September 7, 2023, there was a fire near Raven's Place which resulted in significant damage to Raven's Place and its adjacent property.

110.    On September 14, 2023, an inspection was conducted with Blue Island Building Commissioner Bob Vasilenko, Blue Island Fire Chief David Haywood, and Fire Prevention Officer Joseph Schmitt came to assess damage to the property.

111.    Following the fire, Plaintiffs requested a building permit to repair and replace.

112.    Rather than issuing the requested building permit, the City's building department forced Plaintiffs to request a demolition permit instead of issuing a building permit to repair and replace.

113.    By February 27, 2024, a demolition permit was issued to remove all charred wood and to clean up all debris from the fire.

114.    On or about March 20, 2024, Raymond Thomas went to the building department to pay for the pending permit and was told the City wanted to reinspect the property again, prior to issuing a permit.

115.    Plaintiffs complied with Blue Island's request to inspect the property a second time and on March 25, 2024, Building Commissioner Bob Vasilenko and Fire Prevention Officer Joseph Schmitt came out to reinspect the property.

116.    At the March 25, 2024 inspection, a report was issued which instructed Plaintiffs to remove and replace all charred lumber and replace, submit drawings for floor joist replacement and get further instructions from the electrical and fire prevention department.

117.    On April 2, 2024, Raymond Thomas followed up with Building Commissioner Bob Vasilenko who informed Raymond Thomas that Mr. Vasilenk would need to re-inspect the property (for a third time) after drawings were submitted for the work to be completed.

118.    On April 4, 2024, Bob Vasilenko came back out to re-inspect the property and issued another report that asserted Plaintiffs started work prior to a building permit being issued.

119.    During this visit, Mr. Thomas reminded Mr. Vasilenko that Plaintiffs were instructed to remove and replace all charred lumber and submit drawings for floor joists replacements. Mr. Thomas further reminded Mr. Vasilenko that this request to remove and replace

16

charred lumber was in writing and available for Mr. Vasilenko's review.

120.    At that time, no work had been done to the property owned by Raven's Place outside of replacing the items that Plaintiffs were instructed to remove and replace.

121.    That same day, Blue Island issued a "Stop Work Order" which halted Plaintiffs from repairing the Raven's Place and the surrounding property.

***Raymond Thomas is Accused of Committing Insurance Fraud By Blue Island Officials***

122.    Shortly after the September 7 fire, Mayor Bilotto visited Raven's Place and spoke with Mr. Thomas at the site of the fire.

123.    During this visit, the Mayor made an entirely unfounded and inappropriate remark about Thomas starting the fire at Raven's Place.

124.    Upon information and belief, Blue Island officials, either with the Blue Island Fire Department or elsewhere, made accusations to Mr. Thomas' insurance carrier alleging that Mr. Thomas facilitated or was involved in the September 7, 2023 fire.

125.    Any such accusations and comments are false.

126.    Following the September 7, 2023 fire, Raymond Thomas was deposed as part of a routine examination under oath related to Plaintiffs' insurance claims about the fire.

127.    During this examination, Mr. Thomas was essentially accused of intentionally shutting down Raven's Place's sprinkler system in order to save costs and collect insurance payments.

128.    Specifically, Mr. Thomas was asked the following questions during his examination:

    a)    Did you ever tell a fire investigator for Badger Mutual after the September 7, 2023, fire that the fire sprinkler was not repaired due to the cost to repair

it?

b) After the September 7th fire, did you ever tell Bennett Scott of the Blue Island Fire Department that you shut down the sprinkler system in the building before the fire  because the City revoked your business  license?

129.    Mr. Thomas unequivocally renounced the accusations that he was involved in the September 7, 2023 fire and that Mr. Thomas ever made the comments he was accused of making.

130.    Mr. Thomas was further questioned about alleged comments made to Blue Island officials such as:

a) Okay. Did you tell fire inspector Joe Schmidt of the Blue Island Fire Department after the September fire that the sprinkler system in the building was shut off since June of 2023?

131.    Again, Mr. Thomas denied ever making this statement and denied involvement in the September 7 fire.

132.    Mr. Thomas has never met Bennet Scott of the Blue Island Fire Department and never made the alleged comments.

133.    Similarly, Mr. Thomas did not tell Blue Island fire inspector Schmidt that that sprinkler system was shut off since June 2023.

## **COUNT I – Violation of the Plaintiffs' Fourteenth Amendment Rights**

134.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

135.    Pursuant to the Fifth Amendment of the U.S. Constitution, no person shall be "be deprived of life, liberty, or property, without due process of law."

136.    The Fourteenth Amendment of the U.S. Constitution provides that no state shall "deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws."

137.     Pursuant to 42 U.S.C. Section 1983, Plaintiffs are permitted to file suit against state actors who have violated or are in the process of violating Plaintiffs' constitutional rights under the color of law, including a request for injunctive relief against such constitutional violations.

138.     Plaintiffs, a privately owned bar/nightclub, and video game amusement center, and its owner and manager, are licensed to conduct business in the State of Illinois, including within the City of Blue Island.

139.     Included in these rights, Plaintiffs were allowed to operate a nightclub and a video game amusement center during the timeframe allowed by the City, which is 3 a.m. on Friday and Saturdays and 2 a.m. on weekdays.

140.     Plaintiffs also had a valid liquor license for both establishments, which allowed them to sell alcohol to those of the age of twenty-one and older as permitted with City rules.

141.     Importantly, The Vault was allowed to welcome those of all ages into their establishment as it operated as a video arcade center under local and state laws.

142.     Approximately 70% of The Vault's revenue came from operating its business as a video arcade center catered to children and young adults.

143.     Further, Plaintiffs' business licenses invest in them the right to operate their businesses in Blue Island.

144.     By imposing and enforcing disparate, unfair, and unreasonable restrictions on Plaintiffs and their businesses, Defendants interfered with and took away Plaintiffs' valid property rights under their licenses to operate their businesses as allowed per the city rules.

145.     The Defendants' actions are under color of law within the meaning of the

19

Fourteenth Amendment to the U.S. Constitution.

## Substantive Due Process

### (Arbitrary and Capricious Conduct Under the Color of Law)

146.    Plaintiffs have valid property rights in their businesses.

147.    Moreover, Plaintiffs' business licenses invest in them the right to operate their businesses in the Blue Island area.

148.    Defendants required Raven's Place to cease the sale of any alcohol after 1:30 a.m. and close its premises by 2:00 a.m. on weekends, and The Vault operates only between the hours of 11:00 a.m.—2:00 a.m. on Sunday through Friday and 11:00 a.m. to 2:30 a.m. on Saturdays.

149.    The Agreement ordered by Defendants, also excludes any person under the age of thirty (30) years to enter the licensed premises of Raven's Place and excludes any person under the age of twenty-five (25) years to enter the licensed premises of The Vault.

150.    These actions are irrational and wholly arbitrary as they do not rationally serve any legitimate government interest such that there is a reasonable, rational link including between the health and safety of the people of Blue Island and the requirement that the Vault and Raven's Place close their businesses earlier what is required as provided by Blue Island Code. *See Blue Island Ord. 2014-016*.

151.    While treating similar businesses differently, the Defendants have interfered with Plaintiffs' licensing and rights to operate their business by restricting those over the age of twenty-one (21) but under the age of twenty-five (25) for one business and thirty (30) for the other business in an irrational, wholly arbitrary, and capricious manner as restaurants, bars, and night clubs are entitled to operate their business without restricting age, other than the age of 21 if a bar or night club is serving alcohol, and thus, Plaintiffs should be able to

open their businesses without a further restriction on the age of their patrons outside of that initially required by law as it relates to serving alcohol.

152.    Defendants' requirements have resulted in a loss of business for both establishments, but especially The Vault.

153.    As part of its business structure, The Vault specifically marketed to children, with video games and other amusement-style games. The intention for the Vault, as followed prior to the Agreement, was that during the daytime the business would operate to those of all ages, and at night operate more for adults. Prior to the Agreement, children would have birthday parties, celebrations, or family gatherings at the Vault.

154.    Plaintiff voiced these concerns, and others regarding the operating of both businesses, during a meeting with the City in response to the May 2021 incident. During this meeting, Raymond Thomas expressed that the Agreement's requirement banning patrons under the age of twenty-five (25) would extremely hinder the success of The Vault

155.    These restrictions hindered the success of both businesses, and The Vault suffered a loss of substantial revenue.

156.    Also included in the Agreement is an extensive security plan that was required by Defendants in order for Plaintiffs businesses to be in operation. Indeed, the Defendant instructed Plaintiffs that their certain and specific terms detailed above must be included in the Security Plan.

157.    The restrictions set forth in the Agreement and the Security Plan are irrational, wholly arbitrary, and capricious as restaurants and bar are entitled to operate in a manner that is not so restricting. Moreover, the restrictions are not rationally related to any legitimate government interests purported by Defendants.

158.    By forcing Plaintiffs into these specific restrictions, the Defendants have limited

21

Plaintiffs from fair competition and business it is entitled to.

159.    Plaintiffs' business licenses were issued pursuant to the Blue Island Code and thus are afforded the protections set forth in Title XI, Chapter 110 of the City's Code.

160.    Accordingly, Plaintiffs have been deprived of their property rights for both Raven's Place and the Vault, in violation of the Due Process Clause.

**Unequal Treatment**
**(Different Treatment of Similarly Situated Entities)**

161.    Plaintiffs are similarly situated to other businesses in Blue Island because other business entities are restaurants, entertainment centers, and bars with liquor licenses in the area, some that had to sign an Agreement with the Commissioner after violent incidents occurred in their establishments or on their property.

162.    As set forth above, on January 11, 2022, a drunk patron refused to leave Burr Oak Bowl, who then discharged a firearm while inside the premise. Multiple bullets were fired, and three patrons were hit inside Burr Oak. Due to the shooting, Burr Oak was suspended for seven days, and Defendants signed an agreement with the owner of Burr Oak Bowl.

163.    Upon information and belief, the security plan only included minimal requirements and is in no way similar to the security plan Defendants' ordered Plaintiffs to abide such as additional age requirements.

164.    Upon information and belief, the owner of this business is of Caucasian descent.

165.    As also stated above, on January 16, 2022, a firearm was discharged in the bathroom of Harry's Long Bar. The suspect then fled the scene. In addition, upon police arrival, it was noted that one of the bartenders at Harry's Long Bar was under the age of twenty-one (21).

166.   Due to the shooting, Harry's Long Bar was suspended for seven days, and Defendants signed an agreement with the owner of Harry's Long Bar.

167.   Upon information and belief, the owner of Harry's Long Bar is of Caucasian descent.

168.   Here again, no age requirements were ordered for the owner(s) to continue their business.

169.   Upon information and belief, the security plan only included minimal requirements and is in no way similar to the security plan Defendants' ordered Plaintiffs to abide by.

170.   In February of 2022, a shooting took place near a window of Carlito's Way, when the suspect shot his firearm inside the premises. Due to the shooting, Carlito's Way was suspended for seven days, and Defendants signed an agreement with the owner of Carlito's Way.

171.   Upon information and belief, the owner of Carlito's Way is of Caucasian descent.

172.   Similarly, the agreement did not include that the cocktail lounge follow any additional restriction-based age requirements.

173.   Upon information and belief, the security plan only included minimal requirements and is in no way similar to the security plan Defendants' ordered Plaintiffs to abide by.

174.   The agreements made with the other similarly situated Blue Island establishments stated above are disproportionate to the Agreement Defendants forced upon Plaintiffs, a similarly situated business.

175.   Upon information and belief, Raven's Place and The Vault, both businesses

owned and operated by African Americans are subject to these heightened level of restrictions.

176. While the agreements made with the other establishments included requirements of a safety plan and contract for installation and maintenance of safety cameras, The Vault was required to:

      a) Implement the use of identification scanners and scan the IDs of every patron prior to entry;

      b) Refuse entry to any patron under the age of twenty-five (25);

      c) Cease the sale of any alcohol after 2:00 a.m.;

      d) Close its premises by 2:30 a.m.;

      e) Submit and sign the security plan; and

      f) Schedule an onsite meeting with City staff to reevaluate occupancy limits, liquor license classifications, and compliance with Fire, Health, and Building Codes.

177. The Agreement also placed heightened restrictions on Raven's Place including the requirement to:

      a) Implement the use of identification scanners and scan the IDs of every patron prior to entry;

      b) Refuse entry to any patron under the age of thirty (30);

      c) Cease the sale of any alcohol after 1:30 a.m.;

      d) Close its premises by 2:00 a.m.;

      e) Submit and sign a security plan; and

      f) Schedule an onsite meeting with City staff to reevaluate occupancy limits, liquor license classifications, and compliance with Fire, Health, and Building Codes.

178. Plaintiffs are similarly situated entities as businesses with a liquor license in the City of Blue Island and are being treated equally compared to the extremely less restrained

businesses, in violation of the Equal Protection Clause.

179.     Moreover, the Agreement with Plaintiffs has a disproportionate treatment to the suspect class common to Plaintiffs Raymond Thomas and Dushone Thomas as they are a minority business manager and owner of African American descent.

180.     This degree of the extreme measures imposed by Defendants have only been placed on Plaintiffs, as African American owned and operated businesses, thus violating Plaintiff's equal protection rights.

181.     Defendants' disparate treatment placed upon Plaintiffs is unrelated to any legitimate governmental interest.

182.     While Defendants created the Agreement to purportedly limit crime in the City within its local and state powers, it has created Agreements that are substantively unequal to functionally identical businesses, those in which had shootings inside not outside of the businesses, one of which included a fatal shooting.

183.     These less restrictive and unequal agreements, compared to Plaintiffs' restrictions, have made for easier implementation and guidance for the similarly situated businesses.

184.     In addition to the above instances of discrimination, the City discriminated against Plaintiffs when it came to administrative matters such as reviewing renewal applications for Plaintiffs' business licenses and issuance building permits.

185.     Indeed, the City, through its agents and representatives, intentionally delayed its review of Plaintiffs' licensee applications and did not inform Plaintiffs of any alleged defects with the applications until after 5:00 p.m. on the Friday before New Year's Eve causing significant

delays to Plaintiffs.

186.    The City further intentionally issued a "Stop Work Order" which halted Plaintiffs from repairing the Raven's Place and the surrounding property without just cause to do so.

187.    The City did not have the authority to enter into the Agreement with the Plaintiffs and attempted to do so only did so due to the Plaintiffs' status as a protected class.

188.    Defendants' disparate treatment towards Plaintiffs constitutes a violation of Plaintiffs' constitutional rights under the Equal Protection Clause of the Fourteenth Amendment.

189.    As a result of Defendants' acts and omissions, Plaintiffs have suffered harm including, but not limited to the loss of: (1) revenue for each individual business that is forced to shut down early and stop serving alcohol early in order to comply with the Agreement; (2) revenue for each individual business that is forced to turn away adults of age and children in order to comply with the Agreement, (3) referrals from existing customers for new Business; (4) and reputation and standing in the restaurant and night club community.

190.    As the nature of the harm suffered is difficult to calculate, the harm suffered by Plaintiffs is irreparable.

191.    In addition, as a direct and proximate result of the unlawful conduct as described herein, Plaintiffs have suffered lost profits.

WHEREFORE, Plaintiffs move this Honorable Court for the following relief:

   a)  A declaratory judgment that the Defendants' conduct violates Plaintiffs' rights under the due process and equal protection under the U.S. Constitution;

   b)  An award of monetary damages against Defendants as authorized under 42 U.S.C. § 1983;

    c)      An award of costs and reasonable attorney's fees in favor of Plaintiffs and against Defendants as authorized under 42 U.S.C. § 1988; and

    d)      Such other relief as this Court may deem just and reasonable.

## COUNT II – Violation of the Plaintiffs' Property Rights Under the Illinois Constitution

192.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

193.    Pursuant to Article 1 of the Constitution of the State of Illinois, "[a]ll men are by nature free and independent and have certain inherent and inalienable rights among which are life, liberty and the pursuit of happiness."

194.    Among these rights are the right to contract, the right to do business, and the right to labor freely and without restraint. *See Meadowmoor Dairies v. Milk Wagon Drivers' Union of Chicago,* No. 753, 371 Ill. 377, 385 (1939).

195.    Plaintiffs Dushone and Thomas are a minority business owner and manager in Blue Island and are licensed to conduct business in the State of Illinois, including within the Blue Island market.

196.    Included in their rights to contract, conduct business and labor freely, Plaintiffs' rights included allowing those of legal drinking age inside their business and to drink alcohol in their business, specifically for Raven's Place, as it is a bar-categorized business, as well as allowing people of all ages inside the premises of the Vault, a restaurant-categorized business. *See* Blue Island Ord. 99-287 (§ 111.20).

197.    Moreover, Plaintiffs' business licenses invest in him the right to operate his businesses in the Blue Island area.

198.    In creating the Agreement, which Defendants required Plaintiffs to sign in order to continue operating their businesses, Defendants interfered with and took away Plaintiffs' valid property rights under their licenses to operate their businesses according to state and local rules.

199.    Blue Island is a Municipal corporation whose actions infringe upon Plaintiffs' rights under Article 1 of the Illinois Constitution.

### Due Process
(Dismissed Per this Court's 1/17/24 Order. Realleged for purposes of Appeal)

200.    Plaintiffs have valid property rights in their businesses.

201.    Moreover, Plaintiffs' business licenses invest in them the right to operate their businesses in the Blue Island area.

202.    Plaintiffs were deprived of their due process rights by Blue Islands in numerous ways.

203.    The Agreement, ordering Plaintiffs to exclude any person under the age of thirty (30) years to enter the licensed premises of Raven's Place, and any person under the age of twenty-five (25) years to enter the licensed premises of The Vault is arbitrary and capricious.

204.    The Agreement, ordering Plaintiffs to undergo an extensive security plan that, upon information and belief is much more strenuous than the similarity situated businesses (Including Burr Oak Bowl and Harry's Long Bar)..

205.    Indeed, a FOIA request failed to provide any security agreement for the stated businesses, including Carlito's Way. Upon information and belief, any similarly strenuous security plans did not exist for the other businesses.

206.    The Agreement, which Defendants required to include certain and specific

terms, is arbitrary and capricious in that it requires:

    a) That Plaintiffs must contract with a private security team, chosen by the City, to secure the interior and exterior of the premises;

    b) That the premises be outfitted with security cameras capable of recording to on-premise and off-premises NVR's with a storage capacity of three days;

    c) That the Vault designates or hires an employee to monitor all security cameras throughout the premises in real time to identify "problematic or potentially problematic situations";

    d) That security personnel be equipped with 2-way radios so as to "avert any issue before it becomes problematic";

    e) That The Vault operates only between the hours of 11:00 a.m.—2:00 a.m. Sunday through Friday and 11:00 a.m. to 2:30 a.m. on Saturdays;

    f) The Vault's security team to conduct full body searches and pat downs depending on the "nature and type of event being held at the venue";

    g) Implement the use of "hand clickers" to count the number of patrons and monitor occupancy;

    h) Provide the Blue Island Police Department a weekly line-up of events listing the nature of the event, the expected number of patrons, time of the event, and the event's host(s);

    i) That the venue purposely change its music within 30 minutes of closing to a genre with a slow tempo and reduce the services provided within the venue; and

    j) That management attend monthly meetings with the Chief of Police to review any issues of concern or problem during the month.

    207.    These actions are irrational and arbitrary as they do not rationally serve any legitimate government interest such that there is a reasonable, rational link between the health and safety of the people of Blue Island and the requirement that the Plaintiffs, and only the Plaintiffs, close their businesses between the above stated hours, as well as restrict adult patrons based on age from entering the premises.

208.    Blue Island Ord. 99-287 states that "[n]o person under the age of 21 shall be permitted within the premises of any liquor establishment licensed for the consumption of alcohol on the premises, other than restaurants or banquet type facilities or, unless he or she is with his or her parents or legal guardian." The Agreement placed limits on who Plaintiffs could or could not allow inside its premises property rights, despite the legal requirements set forth in the Code.

209.    According to Blue Island Ord. 99-287, the Liquor Control Commissioner may, as a condition to issuance of any liquor license, impose such conditions and restrictions upon each license as necessary to ensure operation of the establishment shall not be harmful to the safety, morals and welfare of the community. However, the power Defendants have exerted onto Plaintiffs is irrational and arbitrary to the Plaintiff and his businesses as the restrictions have no relation to the result Defendants purport they are enforced to achieve.

210.    Accordingly, Plaintiffs have been deprived of their property rights in violation of the Illinois Constitution's Due Process Clause.

**<u>Unequal Treatment</u>**

211.    Plaintiffs are similarly situated to other businesses in Blue Island because other business entities such as Burr Oak Bowl, Harry's Long Bar, and Carlito's Way are allowed to welcome inside and serve alcohol to those twenty-one and older.

212.    These other businesses have also experienced violent crime as set forth above.

213.    The other Agreements that were made with these similarity-situated businesses do not contemplate or restrict any person on the basis of their age.

214.    As Burr Oak is a restaurant-categorized business, it offers food, bowling, and alcohol to its patrons. The business is known as a family-friendly place where children go

with their friends and families to bowl. Burr Oak's Agreement post-shooting did not include any age restrictions. Harry's Long Bar and Carlito's Way are both bar-categorized businesses, which, post-shootings, did not sign an Agreement that altered or limited the age requirements for those they can and cannot let inside the premises.

215.    Furthermore, upon information and belief, the other Agreements that were made with these similarly-situated businesses do not contemplate or restrict its business to the same degree as Plaintiffs regarding security plans.

216.    Plaintiffs are similarly situated entities as these less-restrained businesses and are being treated differently than the non-restrained businesses in violation of the Equal Protection Clause.

217.    Upon information and belief, the similarly situated entities also have Caucasian owners.

218.    Moreover, the Agreement with Plaintiffs has a disproportionate treatment to the suspect class Plaintiffs common to the individual Plaintiffs as Dushone and Raymond Thomas are minority business owner and manager of African American descent.

219.    The Agreement was more strenuously placed, showing harsher and unequal treatment to Plaintiffs, which are both owned and operated by individuals of African American descent.

220.    The Agreement's disparate treatment is unrelated to any legitimate governmental interest.

221.    While Defendants created the Agreement to purportedly limit crime in Blue Island, it is applying this standard unequally in that functionally identical businesses are not

31

restricted under their own Agreements.

222.    Defendants' unequal application of the purported interest constitutes a violation of Plaintiffs' constitutional rights under Article 1, Section 2 of the Illinois Constitution.

223.    In addition to the above instances of discrimination, the City discriminated against Plaintiffs when it came to administrative matters such as reviewing renewal applications for Plaintiffs' business licenses and issuance building permits.

224.    Indeed, the City, through its agents and representatives, intentionally delayed its review of Plaintiffs' licensee applications and did not inform Plaintiffs of any alleged defects with the applications until after 5:00 p.m. on the Friday before New Year's Eve causing significant delays to Plaintiffs.

225.    The City further intentionally issued a "Stop Work Order" which halted Plaintiffs from repairing the Raven's Place and the surrounding property without just cause to do so. As a result of Defendants' acts and omissions, Plaintiffs have suffered harm including, but not limited to the loss of: (1) revenue for each individual business that is forced to shut down early and stop serving alcohol early in order to comply with the Agreement; (2) revenue for each individual business that is forced to turn away adults of age and children in order to comply with the Agreement, which dramatically impacted business at the Vault, (3) referrals from existing customers for new Business; (4) and reputation and standing in the restaurant and night club community.

226.    As the nature of the harm suffered is difficult to calculate, the harm suffered by Plaintiffs is irreparable.

227.    In addition, as a direct and proximate result of the unlawful conduct as

described herein, Plaintiffs have suffered lost profits.

WHEREFORE, Plaintiffs move this Honorable Court for the following relief:

a) A declaratory judgment that the Defendants' conduct violates Plaintiffs' rights under the due process and equal protection under the Illinois Constitution;

b) An award of monetary damages against Defendants as authorized under 42 U.S.C. § 1983;

c) An award of costs and reasonable attorney's fees in favor of Plaintiffs and against Defendants as authorized under 42 U.S.C. § 1988; and

d) Such other relief as this Court may deem just and reasonable.

## COUNT III – DECLARATORY JUDGMENT – The Agreement between Blue Island and the Vault and Raven's Place

228. Plaintiffs reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

229. Pursuant to the Federal Declaratory Judgment Act, 28 U.S.C. Sec. 2201, this Court is vested with the power to declare the rights and liabilities of the parties hereto and to give such other and further relief that may be necessary.

230. In May 2021, Blue Island provided the required terms for the Agreement and advised Plaintiff Raymond Thomas, acting on behalf of Raven's Place, LLC d/b/a the Vault and Raven's Place, he needed to sign the Agreement in order to stay in business.

231. There can be no mutual assent to the Agreement absent the parties agreement on definite and certain terms.

232. Blue Island did not counter execute the Agreement and expressed doubt as to whether the terms were acceptable when presented with Plaintiffs' signed draft of the

Agreement.

233.     Moreover, Defendants coerced Plaintiffs into signing the Agreement and placed them under duress in an effort to force Plaintiffs to sign.

234.     To do so, Defendants instructed Plaintiffs that their businesses would not be able to re-open if they did not sign the Agreement.

235.     Substantively, certain aspects of the Agreement including, but not limited to, the requirement that Plaintiffs' That the venue purposely change its music within 30 minutes of closing to a genre with a slow tempo and reduce the services provided within the venue and increase the age requirement to enter their businesses are inherently unenforceable.

236.     An actual and justiciable controversy exists between Plaintiffs and Defendant Blue Island as to the validity of the Agreement, which Plaintiff was told to sign if he wished to continue operating his business. This Agreement has also been a guiding factor in revoking Plaintiffs' business and liquor licenses.

WHEREFORE, Plaintiffs prays that this Court enter the following relief:

a)     A declaration declaring the Agreement, including the Security Agreement, entered between Blue Island and Plaintiffs, the Vault, and Raven's Place in May of 2021 is void and unenforceable.

b)     A declaration declaring the Agreement, including the Security Agreement, entered between Blue Island and Plaintiffs, the Vault, and Raven's Place in May of 2021 is void and unenforceable because any such agreement was not properly formed.

c)     A declaration declaring the Agreement, including the Security Agreement, entered between Blue Island and Plaintiffs, the Vault, and Raven's Place in May of 2021 is void and unenforceable because the parties did not have a mutual assent to the specific terms of the Agreement and the Agreement was never fully executed.

d)     A declaration declaring the Agreement, including the Security Agreement, entered between Blue Island and Plaintiffs, the Vault, and Raven's Place in May of 2021 is void and unenforceable because the proposed terms of the Agreement are inherently unenforceable.

## COUNT IV—DEFAMATION PER QUOD

237.    Plaintiffs reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

238.    During Mr. Thomas' Examination Under Oath, Mr. Thomas was questioned and repeatedly accused of facilitating the fire that damaged property adjacent to Raven's Place.

239.    Upon information and belief, the attorney questioning Mr. Thomas at the Examination Under Oath should have had a good faith basis for asking the questions about the September 7 fire that is sourced in statements and information collected from the City of Blue Island.

240.    Most of the accusations against Mr. Thomas were in reference to the accusations that Mr. Thomas was involved in facilitating the September 7 fire. Upon information and belief, these accusations were first raised by sources with the City of Blue Island, including Defendant Bilotto, who previously made similar comments directly to Mr. Thomas.

241.    Mr. Thomas never made any comments that he was involved in, facilitated, or otherwise allowed the September 7 fire.

242.    The accusations that Mr. Thomas was somehow involved in the September 7 fire are verifiably false.

243.    Upon information and belief, Blue Island official including but not limited to Mayor Bilotto, Bennett Scott, and Joe Schmidt made certain defamatory statements to Mr.

Thomas' insurance company that accused Mr. Thomas of being involved in the September 7 fire.

244.    These statements were made with the specific intent to damage Mr. Thomas' reputation and his reputation in the community.

245.    At the time that Blue Island, through its officials, made these statements, they knew that the statements were false or misleading or made these statements with a reckless disregard for the veracity of the statements.

246.    Blue Island's motive when making these statements to Mr. Thomas' insurance company was to harm Mr. Thomas' reputation and cause him financial difficulties such as attorney's fees and costs and delays to Plaintiffs' ability to re-build and repair Raven's Place and its adjacent property.

247.    Despite the fact that a State Fire Marshall issued a report that found that the September 7 fire was accidental, Blue Island recklessly and with the specific intent to harm Mr. Thomas' reputation accused Mr. Thomas of being involved in the September 7 fire.

248.    Each of these statements and the republications of these statements caused Mr. Thomas to incur substantial costs, including attorney fees and costs associated with the Examination Under Oath, emotional distress, anxiety, and damage to Mr. Thomas' reputation.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment against Defendant, and in Plaintiff's favor as follows:

    a)  An award of compensatory damage to be determined at trial;

    b)  Punitive damages in an amount to be determined at trial;

    c)  Incidental and consequential damages in an amount to be proven at trial;

    d)  An award to Plaintiff for reasonable attorneys' fees and costs allowable by law;

e) For actual, special and compensatory damages to be proven at trial; and

f) For such other relief, including injunctive relief, to which Plaintiff may be entitled.

## COUNT V—DEFAMATION PER SE

249. Plaintiffs reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

250. During Mr. Thomas' Examination Under Oath, Mr. Thomas was questioned and repeatedly accused of facilitating the fire that damaged Raven's Place and its adjacent property.

251. Upon information and belief, the attorney questioning Mr. Thomas at the Examination Under Oath should have had a good faith basis for asking the questions about the September 7 fire that is sourced in statements and information collected from the City of Blue Island.

252. Most of the accusations against Mr. Thomas were in reference to the accusations that Mr. Thomas was involved in facilitating the September 7 fire. Upon information and belief, these accusations were first raised by sources with the City of Blue Island, including Defendant Bilotto, who previously made similar comments directly to Mr. Thomas.

253. Mr. Thomas never made any comments that he was involved in, facilitated, or otherwise allowed the September 7 fire.

254. The accusations that Mr. Thomas was somehow involved in the September 7 fire are verifiably false.

255.    Upon information and belief, Blue Island official including but not limited to Mayor Bilotto, Bennett Scott, and Joe Schmidt made certain defamatory statements to Mr. Thomas' insurance company that accused Mr. Thomas of being involved in the September 7 fire.

256.    These statements relate to Mr. Thomas professional reputation as a business owner in Blue Island.

257.    The statements further accuse Mr. Thomas of participating in illegal activity including but not limited to insurance fraud.

258.    These statements were made with the specific intent to damage Mr. Thomas' reputation and his reputation in the community.

259.    At the time that Blue Island, through its officials, made these statements, they knew that the statements were false or misleading or made these statements with a reckless disregard for the veracity of the statements.

260.    Blue Island's motive when making these statements to Mr. Thomas' insurance company was to harm Mr. Thomas' reputation and cause him financial difficulties such as attorney's fees and costs and delays to Plaintiffs' ability to re-build and repair Raven's Place and its adjacent property.

261.    Despite the fact that a State Fire Marshall issued a report that found that the September 7 fire was accidental, Blue Island recklessly and with the specific intent to harm Mr. Thomas' reputation accused Mr. Thomas of being involved in the September 7 fire.

262.    Each of these statements and the republications of these statements caused Mr. Thomas to incur substantial costs, including attorney fees and costs associated with the Examination Under Oath, emotional distress, anxiety, and damage to Mr. Thomas' reputation.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment against Defendant, and in Plaintiff's favor as follows:

a) An award of compensatory damage to be determined at trial but no less than $30,000;

b) Punitive damages in an amount to be determined at trial;

c) Incidental and consequential damages in an amount to be proven at trial;

d) An award to Plaintiff for reasonable attorneys' fees and costs allowable by law;

e) For actual, special and compensatory damages to be proven at trial; and

f) For such other relief, including injunctive relief, to which Plaintiff may be entitled.

## COUNT VI—TORTIOUS INTERFERENCE WITH CONTRACT

270. Plaintiffs reallege and incorporate by reference the foregoing paragraphs as though fully set forth herein.

271. At all times relevant to this Complaint, Plaintiffs Raven's Place, LLC d/b/a Raven's Place and Raven's Place, LLC d/b/a The Vault were insured by Badger Mutual Insurance Company.

272. This relationship was governed by a contract between Badger Mutual Insurance Company and Raven's Place, LLC d/b/a Raven's Place and Raven's Place, LLC d/b/a The Vault.

273. This contract allowed for both Raven's Place LLC entities to be insured by Badger Mutual Insurance Company at a set rate.

274. This contract for insurance existed in September 2023 when Raven's Place, LLC and its adjacent property caught fire.

275. Defendants were aware of the insurance contract between the Raven's Place, LLC entities and Badger Mutual Insurance Company as Plaintiffs provided Defendants with proof of

insurance as part of their application process.

276.    Moreover, upon information and belief, various City officials such as Mayor Bilotto, Bennett Scott, and Joe Schmidt spoke with agents of Badger Mutual Insurance Company regarding the September 7 fire and thus would have been aware of the relationship between Plaintiffs and Badger Mutual Insurance Company.

277.    Following the September 7 fire, Badger Mutual Insurance Company investigated the incident which included an Examination Under Oath for Plaintiff, Raymond Thomas.

278.    During Mr. Thomas' Examination Under Oath, Mr. Thomas was questioned and repeatedly accused of facilitating the fire that damaged Raven's Place and its adjacent property.

279.    Upon information and belief, the attorney questioning Mr. Thomas at the Examination Under Oath should have had a good faith basis for asking the questions about the September 7 fire that is sourced in statements and information collected from the City of Blue Island.

280.    Most of the accusations against Mr. Thomas were in reference to the accusations that Mr. Thomas was involved in facilitating the September 7 fire. Upon information and belief, these accusations were first raised by sources with the City of Blue Island, including Defendant Bilotto, who previously made similar comments directly to Mr. Thomas.

281.    Mr. Thomas never made any comments that he was involved in, facilitated, or otherwise allowed the September 7 fire.

282.   Upon information and belief, Blue Island official including but not limited to Mayor Bilotto, Bennett Scott, and Joe Schmidt made certain defamatory statements to Mr. Thomas' insurance company that accused Mr. Thomas of being involved in the September 7 fire.

283.   Despite the fact that a State Fire Marshall issued a report that found that the September 7 fire was accidental, Blue Island recklessly and with the specific intent to harm Mr. Thomas' reputation accused Mr. Thomas of being involved in the September 7 fire.

284.   The accusations that Mr. Thomas was somehow involved in the September 7 fire are verifiably false and made with the intent to injure Plaintiffs' contractual relationship with its insurer, Badger Mutual Insurance Company.

285.   At the time that Blue Island, through its officials, made these statements, they knew that the statements were false or misleading or made these statements with a reckless disregard for the veracity of the statements.

286.   Blue Island's motive when making these statements to Mr. Thomas' insurance company was to harm Mr. Thomas' reputation and cause him financial difficulties such as attorney's fees and costs and delays to Plaintiffs' ability to re-build and repair Raven's Place and its adjacent property.

287.   As a result of Defendants' false statements to Badger Mutual Insurance Company, Badger Mutual Insurance Company asserted that Plaintiffs had breached their contractual obligations and refused to cover those damages.

288.   As a result of Defendants' false statement to Badger Mutual Insurance Company, Plaintiffs suffered damages such as attorney's fees, costs associated with the delay in repairing Plaintiffs' property and the adjacent property, increased insurance premiums, and the loss of

coverage for the September 7 fire.

WHEREFORE, Plaintiffs respectfully requests that this Court enter judgment against Defendant, and in Plaintiff's favor as follows:

a) An award of compensatory damage to be determined at trial but no less than $30,000;

b) Punitive damages in an amount to be determined at trial;

c) Incidental and consequential damages in an amount to be proven at trial;

d) An award to Plaintiff for reasonable attorneys' fees and costs allowable by law;

e) For actual, special and compensatory damages to be proven at trial; and

f) For such other relief, including injunctive relief, to which Plaintiff may be entitled.

## JURY DEMAND

Plaintiffs hereby demand a jury for all claims set forth herein that are triable by jury.

Dated: December 20, 2024                                    Respectfully submitted,

                                                            By :/s/ John C. Ellis
                                                            Attorney for Plaintiffs

John C. Ellis
David DeSchepper
ELLIS LEGAL, P.C, #59328
200 W. Madison, Suite 2670
Chicago, Illinois  60606
(312) 967-7629
jellis@ellislegal.com
ddeschepper@ellislegal.com